IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, SOUTHERN DIVISION

```
UNITED STATES OF AMERICA    )
                            )
        v.                  )    CRIMINAL ACTION NO.
                            )       1:13cr306-MHT
RODRIGO ESTAVILLO-AVENDANO  )          (WO)
```

## OPINION

Defendant Rodrigo Estavillo-Avendano pled guilty to illegal reentry, pursuant to 8 U.S.C. § 1326(a),(b)(2). The case is before this court for sentencing. Estavillo-Avendano has moved for a downward variance, and the government has requested a term of supervised release. For the reasons discussed below, the downward-variance motion is granted, and the supervised-release request is denied.

## I. BACKGROUND

Estavillo-Avendano was born in Ciudad Acuña, Mexico, six miles across the border from Del Rio, Texas. Since he was an infant, he took frequent weekend trips across the border into Del Rio with his family to shop for

groceries, buy his clothes, and spend nights with relatives. In his youth, he made trips almost daily to Del Rio to play on a little league baseball team, participate in the Boys and Girls Clubs, and, during his entire sixth-grade year, attend school. These trips were regular, and they were legal.

Although he continued to go to the United States most weekends, Estavillo-Avendano attended middle school and high school in Acuña. He was married during high school, at age 16, and he and his wife had their first son soon after.

After high school, when Estavillo-Avendano was 19 years old, he had what he calls a "lost year," and he associated with the wrong people. He drifted away from his wife and son, and began to live for free with friends. These friends, however, were drug traffickers, and the free housing had strings attached. They soon asked him to pay his rent by driving a van across the

border.    The  van  contained  over  26  kilograms  of
marijuana.

Border  Patrol  stopped  the  van  at  the  border,  and
Estavillo-Avendano  fled,  dropping  his  border  permit  in
the  process.   When  he  returned  to  his  house  and  told  the
traffickers  what  happened,  they  beat  him.   After  this
experience,  he  reunited  with  his  wife  and  son,  who
accepted  him  back  into  the  home.

Estavillo-Avendano  obtained  another  legal  permit  for
crossing  the  border,  which  he  used  to  continue  to  shop
and  visit  family  in  the  United  States.   However,  18
months  after  he  abandoned  the  van,  Border  Patrol
recognized  his  name  and  arrested  him.   He  pled  guilty  to
importation  of  marijuana  and  served  16  months  in  prison
for  his  crime.   Following  his  prison  time,  he  was
deported  to  Mexico.

For  the  next  seven  years,  between  2004  and  2011,  he
worked  to  rebuild  his  life  after  prison.   He  worked  two
jobs  to  support  his  family.   At  one,  he  supervised

3

Acuña's parks and green spaces; at the other, he worked on a government project planting trees and flowers along the border fence with the United States. Despite his substantial ties to family and friends across the border, he did not reenter the United States, still fearful from his deportation. His wife continued to visit Del Rio to see family. She also received medical care in the United States for a second pregnancy, and had their second son in a Del Rio hospital.

In 2011--almost a decade after his "lost year"--the Zetas cartel reinitiated contact with Estavillo-Avendano and attempted again to conscript him into drug trafficking. He refused. As he and his wife testified, the cartel members were persistent. They came to Estavillo-Avendano's home three times, as well as to the homes of his mother and mother-in-law.

Estavillo-Avendano and his wife began to worry about the safety of their family. Friends who lived ten to 20 blocks away had been killed by the same cartel members

4

for refusing to cooperate, and young children of prominent community members had been targeted at school. Many families who were able fled, to avoid intimidation and violence. Estavillo-Avendano and his wife felt forced to make the same decision. They elected to reenter the United States rather than put their family at further risk.

They settled in Alabama. Estavillo-Avendano started a lawncare business, and his two children enrolled in school. After work, he would coach his older son's soccer team, help both of his kids with their schoolwork, and attend church with his family.

After Thanksgiving this past year, Estavillo-Avendano was arrested and charged with second-degree theft for shoplifting over $ 500 worth of children's clothes from a department store. He shoplifted because he did not have the money to buy Christmas presents for his children. While in jail, officers from Immigrations and Customs Enforcement (ICE) conducted an alienage

interview, where he admitted that he did not have permission to be in the United States.  His fingerprints were then submitted to ICE.  He has been in custody since November 23, 2013, for a total of 298 days.  Once he serves his sentence, he will face certain deportation. He is likely to confront the same intimidation and violence from the same drug traffickers when he returns to Mexico.

## II. DISCUSSION

The parties raise two issues.  First, Estavillo-Avendano moves for a downward variance from the Sentencing Guidelines range.  Second, the government argues to impose a one-year term of supervised release on him after he completes his prison term.

## A. Downward Variance

Estavillo-Avendano's conviction carries a maximum custodial sentence of 20 years.   8 U.S.C. § 1326(b)(2).

As described below, the Guidelines range is 41 to 51
months.  The government seeks 46 months in custody, and
probation recommends 41 months.  Estavillo-Avendano moves
for a downward variance to 10 months--that is, time
served.

1. Estavillo-Avendano's Guidelines Calculations

To determine a defendant's sentence, the court first
calculates the total offense level under the United
States Sentencing Guidelines.  To do so, the court starts
with the base level for the offense, and then determines
whether any enhancements or reductions apply.  The court
then calculates the Guidelines sentence given the
particular defendant's criminal history.

The Base Offense Level for reentry of removed aliens,
8 U.S.C. § 1326, is 8 points.   USSG § 2L1.2(a).
Estavillo-Avendano also received a 16-point enhancement
because he had previously committed a drug-trafficking
offense for which he received greater than 13 months in

prison.   <u>Id</u>. § 2L1.2(b)(1)(A).  The relevant section
states:

> "(a) Base Offense Level: <u>8</u>
>
> "(b) Specific Offense Characteristic
>
> (1)  Apply  the  Greatest:  If  the  defendant
> previously was deported, or unlawfully remained
> in the United States, after—
>
>> (A) a conviction for a felony that is (i) a
>> drug trafficking offense for which the sentence
>> imposed  exceeded  13  months;  (ii)  a  crime  of
>> violence; (iii) a firearms offense; (iv) a child
>> pornography offense; (v) a national security or
>> terrorism  offense;  (vi)  a  human  trafficking
>> offense;  or  (vii)  an  alien  smuggling  offense,
>> increase by <u>16</u> levels if the conviction receives
>> criminal history points under Chapter Four or by
>> <u>12</u>  levels  if  the  conviction  does  not  receive
>> criminal history points;
>>
>> (B)  a  conviction  for  a  felony  drug
>> trafficking  offense  for  which  the  sentence
>> imposed was 13 months or less, increase by <u>12</u>
>> levels  if  the  conviction  receives  criminal
>> history points under Chapter Four or by <u>8</u> levels
>> if  the  conviction  does  not  receive  criminal
>> history points;
>>
>> (C) a conviction for an aggravated felony,
>> increase by <u>8</u> levels;
>>
>> (D)  a  conviction  for  any  other  felony,
>> increase by <u>4</u> levels; or

>        **(E)    three    or    more    convictions    for**
> **misdemeanors that are crimes of violence or drug**
> **trafficking offenses, increase by 4 levels."**

Id. (emphasis in original).  With this enhancement, his

offense level is 24 points.  After subtracting three base

points  for  acceptance  of  responsibility,  his  total

offense level is 21.

The past drug-trafficking offense places Estavillo-

Avendano in criminal history category II.  The Guidelines

range for a defendant with a 21-point offense level and

a criminal history category of II is 41 to 51 months.


## 2. Judicial Discretion in Sentencing

Having reviewed the Guidelines calculation, the court

must  now  determine  a  reasonable  sentence.   Under  the

Supreme Court's current Booker framework, the Sentencing

Guidelines are not mandatory.  United States v. Booker,

543 U.S. 220 (2005).  Instead, the district court must

independently determine a reasonable sentence by applying

the sentencing factors listed in 18 U.S.C. § 3553(a):

9

"(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

"(2) the need for the sentence imposed--

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

"(3) the kinds of sentences available;

"(4) the kinds of sentence and the sentencing range established for--

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the [sentencing] guidelines ...

"(5) any pertinent policy statement [by the Sentencing Commission] ...

"(6) the need to avoid unwarranted sentence disparities among defendants

with similar records who have been found
guilty of similar conduct; and

"(7) the need to provide restitution to
any victims of the offense."

While calculations by the Guidelines are an attempt to
approximate these diverse factors, a judge may, in the
course of an individual sentencing, determine that "the
case at hand falls outside the 'heartland' to which the
Commission intends individual Guidelines to apply [or]
the Guidelines sentence itself fails properly to reflect
§ 3553(a) considerations."  Rita v. United States, 551
U.S. 338, 351 (2007).

A sentencing judge may also adjust a defendant's
sentence based on a policy disagreement with the
Sentencing Guidelines.  Kimbrough v. United States, 552
U.S. 85 (2007).  However, "closer [appellate] review may
be in order when the sentencing judge varies from the
Guidelines based solely on the judge's view that the
Guidelines range fails properly to reflect § 3553(a)
considerations even in a mine-run case."  Id. at 109.  In

11

Kimbrough, for example, the Supreme Court affirmed a district court's downward variance that was based on both a policy disagreement with a Guidelines sentence that did not take account of "empirical data and national experience," as well as on an independent appraisal of the defendant's individual circumstances. Id. at 110.

### 3. Downward Variance

Estavillo-Avendano argues for a downward variance because his individual circumstances do not fall into the heartland of cases and because the 16-point enhancement does not reflect § 3553(a) factors.

### a. Outside the Heartland

### i. Illegal Reentry

Estavillo-Avendano first argues that his reasons for illegal reentry were not typical of the average case. The court agrees.

12

Estavillo-Avendano and his wife credibly described the fear for their family that led them to move to Alabama.  Members of the Zetas cartel were attempting to recruit him and had visited his home, and the homes of his relatives, on numerous occasions.  Both Estavillo-Avendano and his wife described the deaths of friends in the neighborhood, as well as threats to cartel opponents and schoolchildren, that were driven by the cartel's monopoly on power in their hometown.  Indeed, as Estavillo-Avendano's wife testified, the police were ineffectual in protecting public safety.  To protect themselves from violence, Estavillo-Avendano and his wife brought their family to the United States.  Reentry was the best option among a menu of undesirable choices.

Estavillo-Avendano's single illegal reentry into the United States bolsters his testimony that he came here to protect his family.  After being deported in 2004, he did not illegally enter the country for seven years--until he credibly believed that his family was in danger.  This is

13

especially powerful evidence because of the strong ties
that he maintained to the United States.  He spent almost
every weekend until he was 19 in the United States; he
played on a sports team and attended at least one year of
schooling in the United States; his second son was born
in the United States and is a United States citizen; and
he has numerous family members and friends living in the
United States.  Yet, he abided by the law until he felt
he had no choice.

This case, then, is not typical.  Estavillo-Avendano
did not enter the United States to traffic drugs; rather,
he fled Mexico to <u>avoid</u> trafficking.  Despite his recent
theft crime, he did not come to steal from others.
Indeed, the theft of children's clothes for Christmas
presents, while serious, does not paint the portrait of
a hardened criminal.  He did not even come for the
economic opportunity that brings many immigrants, given
that he and his wife had stable jobs in Mexico and had to
rebuild everything once in Alabama.  He entered the

14

country to protect his wife and family from harm.  While the court takes illegal reentry seriously, it must at the same time acknowledge the humanity that leads parents to protect their children.

## ii. Underlying Offense

Estavillo-Avendano also argues that the 16-point enhancement from the underlying crime "reaches farther than government interests justify."  <u>United States v. Zunun-Morales</u>, 2013 WL 6080065, at *1 (M.D. Ala. 2013) (Thompson, J.).

The purpose of the 16-point enhancement for the underlying crime is to punish and deter those who commit a serious felony in the United States and then reenter the country after deportation.  <u>See</u> <u>U.S. Sentencing Guidelines Manual</u> app. C-Vol. I 241 (2003) (Amendment 375); <u>United States v. Galvez-Barrios</u>, 355 F. Supp. 2d 958, 962 (E.D. Wisc. 2005) (Adelman, J.) (tracing history of the enhancement).  The main targets of the enhancement

are terrorists, human smugglers, child pornographers,
violent criminals, and serial drug traffickers.   See
Zunun-Morales, 2013 WL 6080065, at *2; see also United
States v. Pahua-Martinez, 2009 WL 2003241, at *7 (D. Neb.
2009) (Bataillon, C.J.) ("The history of legislative
enactments with respect to immigration sentencing
reflects Congressional concern with dangerous drug
traffickers and violent criminals."); United States v.
Vallecillo-Rodriguez, 770 F. Supp. 2d 1194 (D.N.M. 2011)
(Johnson, J.) (applying 16-point enhancement based on
underlying crime of second-degree murder).

A number of district courts have varied downward when
the 16-point enhancement "did not reflect the degree of
dangerousness that could justify such a dramatic
increase" in the sentence. Galvez-Barrios, 355 F. Supp.
2d at 964.   For example, in Zunun-Morales, this court
confronted the issue of whether to vary downward from a
Guidelines sentence with a 16-point enhancement for a
previous alien-smuggling charge.   2013 WL 6080065, at *1.

The case was in many ways atypical: the defendant had paid a driver to take him and several others, with whom he seemed to have a personal relationship, to North Carolina.  Id.  In other words, he was not a serial trafficker with a profit motive.  Id. at *1-*2. Given that the case was outside the heartland, this court granted the downward variance.  Id. at *2; see also Galvez-Barrios (varying downward when previous conviction for shooting another person while trying to recover his stolen property had been almost a decade earlier); United States v. Apodaca-Leyva, 2008 WL 2229550, at *1 (D.N.M. 2008) (Browning, J.) (varying downward from 46-57 month range based on 16-point enhancement to 10 months imprisonment where underlying crime was a DWI with injuries and had occurred when defendant was 18); Pahua-Martinez, 2009 WL 2003241 at *2, *6-*8 (granting downward variance from 16-point enhancement because it overstated seriousness of the offense despite defendant's criminal

history of IV, and release from prison only two years earlier).[1]

Here, the specifics of the crime and Estavillo-Avendano's subsequent turnaround make a 16-point enhancement unreasonable. When he was 19 years old, Estavillo-Avendano attempted to transport a large amount of marijuana across the border. He had never trafficked before, he did not use violence, and he was subsequently badly beaten by his associates for abandoning the vehicle. He returned to his family and made a resolution never to traffic again.

He has made good on that resolution. In the 13 years since he was arrested at 19, he has built a different life. He has a wife and two children, worked two jobs in Mexico, started his own business in the United States, coaches his son's soccer team, and helps his kids with

_____

1. While defendants may seek variances for 16-point enhancements, the Eleventh Circuit has upheld their constitutionality despite concerns of double-counting criminal history. See United States v. Adeleke, 968 F.l2d 1159, 1160-61 (11th Cir. 1992).

18

their schoolwork.  The recent theft charge for stealing children's clothing had no link to drugs and was an aberration.  While a harsh punishment might serve to deter the 19 year-old Estavillo-Avendano, the court finds the 32 year-old Estavillo-Avendano to be a very different person.  He also currently is not--and never has been--a serious drug trafficker.

In sum, based on the facts and circumstances of Estavillo-Avendano's case, the court finds time served of 10 months a reasonable sentence under § 3553.  It finds that his seven years without illegal reentry demonstrates respect for the law.  Moreover, the impetus for his reentry--the protection of his family--is a profound mitigating factor.  The court also finds that, in this individual case, the Guidelines range yields a sentence greater than necessary.  The additional deterrence served by the enhancement is not properly directed towards a person whose crimes consist of one abandoned effort at drug trafficking and stolen children's clothes for

19

Christmas presents.  Last, the court notes that,
regardless of the punishment issued today, Estavillo-
Avendano will certainly be deported once released from
custody.  The heavy sentence he will face if he were to
ever attempt to reenter again already serves as a
sufficient deterrent.  These unique circumstances place
him well outside the heartland of usual cases and warrant
a downward variance to 10 months.

   b. The Policy Rationale of the 16-point Enhancement

    Estavillo-Avendano next argues that the 16-point
enhancement provided for in USSG § 2L1.2 does not reflect
the § 3553 factors.  As discussed above, the atypical
circumstances of this case merit a downward variance to
10 months, or time served.  As such, the court need not
fully address this issue.

    However, the court notes that the policy behind the
16-point enhancement has been criticized before.  When
the Commission adopted the 16-point enhancement in 1991,

it "did no study to determine if such sentences were
necessary--or desirable from any penal theory.  Indeed,
no research supports such a drastic upheaval.  No
commission studies recommended such a high level, nor did
any known grounds warrant it."  Robert J. McWhirter & Jon
M. Sands, "A Defense Perspective on Sentencing in
Aggravated Felon Re-Entry Cases," 8 Fed. Sen. Rep. 275
(Mar./Apr. 1996).  Even though the Commission has since
provided more gradations for § 2L1.2, "application of the
guideline will remain problematic for certain
defendants," particularly where the "defendant was not a
danger to society."  Galvez-Barrios, 355 F. Supp. 2d at
963; see also Caleb E. Mason & Scott M. Lesowitz, A
Rational Post-Booker Proposal for Reform of Federal
Sentencing Enhancements for Prior Convictions, 31 N. Ill.
U. L. Rev. 339, 344 (2011) ("Despite the high stakes of
the re-entry enhancements, the Sentencing Guidelines do
not define the enhancement categories with any degree of
precision.").  As these critics point out, the Booker

21

court specifically warned about Guidelines without empirical backing that impose unduly harsh sentences.

Even the government itself could not offer a justification for the enhancement. When asked why the Guidelines provide for a 16-point enhancement for all drug-trafficking sentences over 13 months, the government simply responded, "I didn't draft the Guidelines, Your honor. That's what they say." Sent. Hr'g, United States v. Estavillo-Avendano, case no. 1:13cr306 (M.D. Ala. argued Sept. 16, 2014).

This case demonstrates the potential problems with the 16-point enhancement. Without rationale, the Guidelines lump a non-violent, one-time drug trafficker into the same category as violent, repeat traffickers, without recognizing any sentencing gradation. The same category also includes violent criminals, those with firearms offenses, child pornographers, terrorists, human traffickers, and alien smugglers. Here, a Guidelines sentence that would normally be less than one year was

enhanced to potentially greater than four because of this indiscriminate enhancement.

This court varies downward in this case because it is outside the heartland, but other district courts could use their discretion to reach a different conclusion in cases with slightly less extraordinary facts. Such an inconsistent application of the enhancement produces disparity in sentencing across courts. More to the point, many defendants could be given a harsher sentence than is truly warranted under § 3553.

### B. Supervised Release

The government also argues that Estavillo-Avendano should be given a term of supervised release.

In 2011, the U.S. Sentencing Commission adopted an amendment to the supervised-release Guidelines addressing illegal reentry cases. The amendment states:

> "The court <u>ordinarily</u> should not impose a
> term of supervised release in a case in
> which supervised release is not required by

> statute and the defendant is a deportable
> alien who likely will be deported after
> imprisonment."

USSG § 5D1.1(c) (emphasis added).

In explaining the amendment, the Guidelines' commentary notes that the threat of a new prosecution in the case of reentry ordinarily provides adequate deterrence and is sufficient to protect the public, but a court may impose supervised release if "it would provide an added measure of deterrence and protection based on the facts and circumstances of a particular case." Application Note 5 to USSG § 5D1.1.

Even with reference to the commentary, the definition of 'ordinarily' or the 'ordinary case' is ambiguous. Merriam Webster's defines 'ordinarily' as "in the ordinary course of the events," and ordinary as "occurring or encountered in the usual course of events: not uncommon or exceptional: not remarkable." Merriam-Webster's Third New International Dictionary 1589 (2002).

The question then is, What type of case is so unusual or remarkable such that a sentence should provide for supervised release to ensure additional deterrence and protection?  The Eleventh Circuit Court of Appeals has affirmed under an abuse-of-discretion standard a wide variety of factors that answered this question.  Courts have looked to the number and timing of illegal entries. See United States v. Garza-Mendez, 735 F.3d 1284, 1292 (11th Cir. 2013) (ordering three years of supervised release based in part on an illegal reentry one month after removal); United States v. Cruz, 482 Fed. App'x 528, 530 (11th Cir. 2012) (considering multiple reentries and removals in affirming supervised release).  They have also looked to the underlying crime, see Garza-Mendez, 735 F.3d at 1292 (domestic violence); earlier disrespect for law enforcement, such as evading arrest or failure to appear, see United States v. Valdez-Cruz, 510 Fed. App'x 834, 840 (11th Cir. 2013); and even having family in the

25

United States as a reason for needing additional deterrence, see id. at 840; Cruz, 482 Fed. App'x at 530.

Of course, when a circuit court holds that a district court did not abuse its discretion in finding extraordinary circumstances, other district courts need not shift to a new default rule.  For example, while other courts have considered family in the United States as a remarkable factor in favor of a more severe sentence, it is inconceivable to this court that an undocumented worker having family in the United States is remarkable or unusual in an illegal reentry case. Moreover, without data showing otherwise, it is unclear if a defendant with multiple reentry attempts or one who reenters soon after being removed is outside of the ordinary.

Indeed, among the factors given above, only one seems out of the ordinary: serious crimes.  With serious crimes, a court might impose a longer sentence in order to provide additional public protection.  For example, a

defendant's recent domestic-violence charge might warrant an imposition of supervised release to protect the family in the United States.

The Guidelines range provides an indicator of the seriousness of the defendant's crime and thus a starting point for deciding whether a case involving a deportable alien, like the one before the court, is out-of-the-ordinary and would merit supervised release. However, the Guidelines are not dispositive. Rather, they are a proxy for evaluating the individual history and circumstances of each defendant.

In this case, the Guidelines do not paint an accurate picture of the history and circumstances of the defendant. The Guideline range in this case is 41 to 51 months. However, the same factors leading to the downward variance cut against supervised release. As discussed above, Estavillo-Avendano's criminal history category of II is based on a single drug-trafficking charge from when he was a teenager. His reentry was to

protect his family, and not to create the violence or crime that would warrant additional deterrence.

Given these circumstances, the court finds that there is not an extra-"ordinary" need for deterrence or public safety in this case, as contemplated under the Sentencing Guidelines.   Indeed, the court has already found that what is atypical about this case is profound mitigating factors that necessitate a <u>less</u> severe sentence.   The court will not impose a term of supervised release here.


\*\*\*

Based on the factors stated above, the court will sentence defendant Rodrigo Estavillo-Avendano to ten months, that is time served, with no supervised release.

DONE, this the 24th day of September, 2014.

<u>   /s/ Myron H. Thompson   </u>
UNITED STATES DISTRICT JUDGE